**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHAD D. PRITCHETT,** | ‖ | |
| **Plaintiff,** | ‖ | **No. C09-2026** |
| vs. | ‖ | **RULING ON JUDICIAL REVIEW** |
| **MICHAEL J. ASTRUE,**<br>**Commissioner of Social Security,** | ‖ | |
| **Defendant.** | ‖ | |

_____

**TABLE OF CONTENTS**

*I.*    *INTRODUCTION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*II.*   *PROCEDURAL BACKGROUND*. . . . . . . . . . . . . . . . . . . . . . .  2

*III.*  *PRINCIPLES OF REVIEW*. . . . . . . . . . . . . . . . . . . . . . . .  3

*IV.*   *FACTS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
    *A.*   *Pritchett's Education and Employment Background*. . . . . . . . . . . .  5
    *B.*   *Initial Administrative Hearing Testimony*. . . . . . . . . . . . . . . .  6
        *1.*   *Pritchett's Testimony*. . . . . . . . . . . . . . . . . . . .  6
        *2.*   *Vocational Expert's Testimony*. . . . . . . . . . . . . . . .  8
    *C.*   *Supplemental Hearing Testimony*. . . . . . . . . . . . . . . . . . .  8
        *1.*   *Pritchett's Testimony*. . . . . . . . . . . . . . . . . . . .  8
        *2.*   *Medical Expert's Testimony*. . . . . . . . . . . . . . . . .  9
        *3.*   *Vocational Expert's Testimony*. . . . . . . . . . . . . . .  11
    *D.*   *Pritchett's Medical History*. . . . . . . . . . . . . . . . . . . .  12

*V.*    *CONCLUSIONS OF LAW*. . . . . . . . . . . . . . . . . . . . . . . .  18
    *A.*   *ALJ's Disability Determination*. . . . . . . . . . . . . . . . . .  18
    *B.*   *Objections Raised by Claimant*. . . . . . . . . . . . . . . . . . .  20
        *1.*   *RFC Assessment and Hypothetical Question*. . . . . . . . . . .  21
        *2.*   *The Opinions of Drs. Anand and Manshadi*. . . . . . . . . . .  23
        *3.*   *Pritchett's Remaining Objections*. . . . . . . . . . . . . . .  26
    *C.*   *Reversal or Remand*. . . . . . . . . . . . . . . . . . . . . . . .  27

*VI.*   *CONCLUSION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*VII.*  *ORDER*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

## I.  INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Chad M. Pritchett on June 9, 2009, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits.  Pritchett asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits.  In the alternative, Pritchett requests the Court to remand this matter for further proceedings.

## II.  PROCEDURAL BACKGROUND

On April 27, 2006, Pritchett applied for both disability insurance benefits and SSI benefits.[1]  In his applications, Pritchett alleged an inability to work since April 12, 2005 due to back pain, carpal tunnel syndrome, depression, asthma, and allergies.  Pritchett's applications were denied on August 23, 2006.  On November 16, 2006, Pritchett's applications were denied on reconsideration.  On December 11, 2006, Pritchett requested an administrative hearing before an Administrative Law Judge ("ALJ").  On September 10, 2008, Pritchett appeared via video conference with his attorney before ALJ Marilyn P. Hamilton.  Pritchett and vocational expert George Paprocki testified at the hearing. Following the hearing, the record remained open to allow Pritchett to submit additional evidence.  On January 23, 2009, Pritchett appeared with his attorney a second time via video conference before ALJ Hamilton for a supplemental hearing.  Pritchett, Dr. Thomas H. England, an impartial medical expert, and vocational expert Vanessa May testified at the supplemental hearing.  In a decision dated March 31, 2009, the ALJ denied Pritchett's claims.  The ALJ determined that Pritchett was not disabled and not entitled to disability

---

[1] Pritchett had previously applied for SSI benefits in July 1995.  On October 31, 1995, Pritchett was awarded SSI benefits by initial determination due to depression and a seizure disorder.  Pritchett's SSI benefits ended in September 1998, because the Social Security Administration determined that his disability had ceased, and he was able to perform his past relevant work as a dishwasher, order picker, and janitor.  *See* Administrative Record 127-39.

insurance benefits or SSI benefits because he was functionally capable of performing other work that exists in significant numbers in the national economy. Pritchett appealed the ALJ's decision. On April 22, 2009, the Appeals Council denied Pritchett's request for review. Consequently, the ALJ's March 31, 2009 decision was adopted as the Commissioner's final decision.

On June 9, 2009, Pritchett filed this action for judicial review. The Commissioner filed an Answer on August 18, 2009. On September 18, 2009, Pritchett filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that he could perform other work that exists in significant numbers in the national economy. On December 14, 2009, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On June 30, 2009, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id*.

The Court will "affirm the ALJ's decision 'if the ALJ's findings are supported by substantial evidence on the record as a whole[.]'" *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's

determination. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004)); *see also Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.' *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Wagner*, 499 F.3d at 848 (citing *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id*. (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id*. at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Moore*, 572 F.3d at 522 ("'If there is substantial evidence to support the

Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).''); *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001) (''As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.'').

## IV. FACTS

### A. Pritchett's Education and Employment Background

Pritchett was born in 1976. He completed the ninth grade and later earned his GED in 1999. While in school, Pritchett took special education courses for learning and behavioral disabilities. At the initial administrative hearing, Pritchett's attorney questioned Pritchett regarding his current intellectual abilities:

> Q: . . . Are you able to read, write, speak and understand the English language?
> A: Yeah. I do have difficulties.
> Q: What kind of difficulties?
> A: Understanding certain aspects of it.
> Q: Such as?
> A: A lot of times I have problems with bigger words and don't understand clearly what they mean.
> Q: Okay. Are you able to read a newspaper?
> A: From time to time.
> Q: Are you able to add, subtract, make change?
> A: I'm actually decent with math.
> Q: So is that a yes?
> A: Yeah. Yes, it is.
> Q: Okay. Do you know how to pay bills?
> A: No. I really don't.

(Administrative Record at 39-40.)

The record contains a detailed earnings report for Pritchett. The report covers Pritchett's employment history from 1990 to 2007. He had no earnings in 1990. Pritchett had nominal earnings from 1991 to 1996, earning between $139.50 (1991) and $1,297.50

(1996).  After 1996 and until 2005, he earned between $4,544.68 (1999) and $26,445.41 (2003).  Pritchett had no earnings in 2006 and 2007.

### B.  Initial Administrative Hearing Testimony

### 1.  Pritchett's Testimony

At the initial administrative hearing, Pritchett's attorney asked Pritchett whether he was capable of performing any of his past jobs.  Pritchett replied "probably not," and explained that working causes him to "get really weak and start getting sick."[2] Specifically, Pritchett referred to constant back pain.  He explained that lifting or repetitive movement exacerbates his back pain, making it "very sore" and causing him difficulty with walking.

The ALJ asked Pritchett to further describe his back pain.  Pritchett testified that he has sharp pain in his lower back throughout most of the day and into the night. According to Pritchett, standing or sitting for long periods of time aggravates his back pain.  He testified that he could stand for about 15 minutes at one time, and sit for about 30 minutes at one time.  Other than Advil, Pritchett stated that he does not take any pain medication for his back.

In regard to his back pain, the ALJ also questioned Pritchett:

> Q:    Okay.  What's the heaviest thing that you lift and carry now?
> A:    I really don't lift anything up right now other than like help my wife with groceries, you know, minor stuff, you know --
> Q:    How many bags --
> A:    -- pick up --
> Q:    -- groceries would carry at one time?
> A:    About two.
> Q:    How many gallons of milk would you carry at one time?
> A:    One.

(Administrative Record at 46-47.)

_____

[2] *See* Administrative Record at 41.

The ALJ continued to question Pritchett, and asked him to describe his social interactions with other people. According to Pritchett, he doesn't get along with other people. Specifically, Pritchett testified that when he goes out in public, he has panic attacks, freezes up, and tries to get away from people. The ALJ also questioned Pritchett about his concentration. Pritchett claimed that he has difficulty with concentration "from time to time," and forgets things that he needs to complete a job.

Pritchett's attorney returned to questioning Pritchett, and asked Pritchett whether he continued to suffer from serious seizures. Pritchett replied that it had "been awhile" since he suffered a grand mal seizure, but he had minor seizures about every other week. According to Pritchett, the minor seizures generally last five to fifteen minutes.

Next, Pritchett's attorney asked Pritchett about his mental health. When asked whether he was depressed, Pritchett answered that he was depressed. Pritchett's attorney asked Pritchett specific questions about his depression:

Q: When you're in a bad mood, what do you feel like?
A: I feel suicidal, sometimes homicidal. I can fly off the handle and be a real bad person, but then I don't even like me even.
Q: Have you attempted suicide?
A: Yes, I have.
Q: When was the last time?
A: Actually, last October.
Q: Of 2007?
A: Yeah.
Q: What did you do?
A: I tried hanging myself and I had to hide my neck from everyone for about a week because of bruises. . . .
Q: And you said you have some homicidal thoughts as well?
A: Yeah.
Q: What do you think about when you have those?
A: I had problems with one of my ex-girlfriends and it go[t] pretty violent. They put me on medication and I was literally just daydreaming about killing her, you know, stalking her and then doing what I had to do to hurt -- harm her.

(Administrative Record at 55-56.) Pritchett testified that he sees a counselor to help with his depression.

### 2.    *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert George Paprocki with a hypothetical for an individual who is able to perform:

> . . . medium work . . . with the following additional limitations, only occasional handling, occasionally fingering, avoid concentrated exposure to fumes, odors, dust, gases and poor ventilation, avoid concentrated exposure to hazards such as moving machinery and unguarded heights, no driving on the job. The person is able to do only simple, routine, repetitive work with only simple work-related [d]ecisions and few workplace changes, no requirement to read instructions, write reports or do math calculations on the job, no contact with the public and no contact with co-workers as part of the job. The work would be essentially isolated with only occasional supervision needed and the work would deal with things rather than people.

(Administrative Record at 67.) The vocational expert testified that under such limitations, Pritchett could not perform his past relevant work. The vocational expert concluded that Pritchett could, however, perform the job of a surveillance system monitor (350 positions in Iowa and 40,000 positions in the nation). In discussing the surveillance system monitor job, the vocational expert opined that "the limitations that you're [(the ALJ)] placing on handling and fingering, the limitations on use of academics and also dealing with the general public, that pretty well cuts out everything except this particular job."[3]

### C. Supplemental Hearing Testimony

### 1.    *Pritchett's Testimony*

At the supplemental hearing, the ALJ asked Pritchett to explain why his mental health difficulties kept him from working. Pritchett testified that:

---

[3] *See* Administrative Record at 70.

> A: Well, mentally, I'm not stable enough to be at -- mentally, if I'm at a job, I'm a mess. You know, it's like I have a hard time keeping up with people. I have a hard time getting along with people. I really don't like going out in public. I don't -- I have difficulties just communicating for the most part and, I mean, I do have a learning disability which makes it hard for me to learn my job.

(Administrative Record at 86-87.)

Pritchett's attorney also questioned Pritchett. Pritchett's attorney asked Pritchett about his physical health history. When asked about past carpal tunnel surgeries, Pritchett stated that he had surgery twice on both arms since 2006. According to Pritchett, even after the four surgeries, he continues to have difficulty gripping with his left hand, and does not "really use" his right hand very much. Pritchett also stated that he has difficulty with acid reflux and has "a lot of discomfort" with his stomach. Lastly, Pritchett testified that he finds it difficult to fall asleep at night, and sometimes is not able to go to bed until 5:00 a.m. the following morning. As a result, Pritchett stated he sometimes has difficulty staying awake during the day.

### 2. *Medical Expert's Testimony*

Dr. Thomas England, a licensed psychologist, provided expert medical testimony at the supplemental hearing. The ALJ asked Dr. England:

> Q: Okay. What medically determinable impairments does [Pritchett] have from a psychological standpoint?
>
> A: . . . With respect to the 12.04 category, I would note that Dr. Roja who has been the most recent treating medical professional, he appears to have diagnosed depressive disorder. . . . [I]t appears as though that's the diagnosis he's maintained through the course of his treatment contacts. . . . I would say that it's likely the major depressive disorder recurrent would be an accurate diagnosis[.]

(Administrative Record at 97-99.) Dr. England also opined that Pritchett had a low average IQ and anxiety disorder. When asked whether Pritchett's medically determinable

impairments individually and/or in combination met the Social Security listings, Dr. England replied that Pritchett's impairments did not meet the listings. Dr. England explained:

> What I would mean by that is that there is apparently a recurrent depression and I would say that there is some likelihood that on the basis of perhaps once a year or so, twice a year perhaps, for a brief period of time, though, not for an extended period of time, it may result in marked levels of impairments socially [and] in concentration, persistence and pace but not on an ongoing basis it would appear.

(Administrative Record at 102.) Dr. England further explained that a "brief period of time" would be generally be two weeks or less.[4]

Dr. England concluded generally, however, that Pritchett would have the following limitations: mild to moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.[5] Specifically, Dr. England opined that:

---

[4] *See* Administrative Record at 102 (ALJ asking Dr. England what timeframe he considered brief, and Dr. England answering two weeks or less).

[5] *See* Administrative Record at 105 (ALJ asking Dr. England his opinions on Pritchett's limitations in the areas of activities of daily living, social functioning, and concentration, persistence, and pace). Later, during the supplemental hearing, Pritchett's attorney asked Dr. England similar questions regarding Pritchett's limitations in the areas of activities of daily living, social functioning, and concentration, persistence, and pace:

> Q: Would you say then that at least once or twice a year there would be periods of exacerbation of up to two weeks? Would that --
>
> A: It would --
>
> Q: -- be accurate?
>
> A: It would appear likely. Yes.
>
> Q: And so that I understand your testimony, during those periods, is it your opinion then that he would have marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence, pace?

(continued...)

. . . other than those periods of exacerbation that at a moderate level of impairment would be . . . understanding and remembering detailed instructions as well as carrying them out, maintaining concentration and attention for extended periods, performing activities within a schedule or maintaining regular attendance, working in coordination or proximity to others without being distracted, again, completing a normal workday or workweek without interruption of psychologically based symptoms, interacting with the public appropriately, accepting instructions and responding appropriately to criticisms, getting along with co-workers or peers, traveling in unfamiliar places or using public transportation and setting realistic goals or making plans independently of others. I would say those would all likely be moderate more or less ongoing and I would say the others would be either non-significantly limited or there is not evidence of limitations.

(Administrative Record at 103-04.)

### 3. Vocational Expert's Testimony

At the supplemental hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who is able to perform medium work and has the following additional limitations:

They're bilaterally limited to occasionally handling and fingering. The person is a left-handed individual if that factors into this. The person should avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation and to hazards such as moving machinery and unguarded heights. The person should do no driving on the job. The person is able to do only simple, routine, repetitive work, no requirement to read instructions or write reports, only simple work-related

---

[5] (…continued)

A:   It would appear so. Yes. . . .
Q:   And is it your testimony then that the rest of the time you would have moderate impairment in the areas that I mentioned, the social functioning and the concentration, persistence in pace?
A:   Yes. That's what I had said.

(Administrative Record at 107-08.)

> decisions and few workplace changes, only occasional contact
> with the public and co-workers and no more than a regular
> pace.

(Administrative Record at 114.) The vocational expert testified that under such limitations, Pritchett could not perform his past relevant work. The vocational expert further testified that Pritchett could, however, perform the following work: (1) information clerk (700 positions in Iowa and 76,000 positions in the nation), (2) usher (900 positions in Iowa and 100,000 positions in the nation), and (3) tanning salon attendant (150 positions in Iowa and 11,000 positions in the nation).

### D. Pritchett's Medical History

On June 7, 2004, Pritchett was examined by Dr. Robert Federhofer, D.O. for back pain. Pritchett rated his pain as 8 on a scale of 1 to 10. Dr. Federhofer noted that Pritchett first indicated that his pain was located around his chest wall, and later indicated that the pain was located in his low back. Dr. Federhofer further noted that the location of Pritchett's pain is:

> somewhat difficult to pin . . . down, but he apparently has no
> aggravating or relieving factors. It is there all the time.
> [Pritchett] is very nonspecific and somewhat evasive as to
> locations of pain and characteristics of pain.

(Administrative Record at 454.) Upon examination, Dr. Federhofer found that Pritchett "moved without difficulty and flexion, standing, walking, sitting and standing positions are achieved without any significant difficulty."[6] Dr. Federhofer diagnosed Pritchett with chronic pain syndrome and depression. Dr. Federhofer concluded that Pritchett should be:

> seen by psychiatry or possibly best by [a] pain
> psychologist[.] . . . He is obviously noncompliant with
> medications that would be helpful to controlling his
> depression. I think this is very possible because of his young
> age and depression he could very well have some somatization.

---

[6] *See* Administrative Record at 454.

(Administrative Record at 455.)  Dr. Federhofer recommended Piroxicam and Tylenol as treatment.

On October 31, 2005, Pritchett was evaluated by Dr. Bo T. Headlam, M.D., for low back and wrist pain.  Dr. Headlam noted that Pritchett had a longstanding history of low back and wrist pain.  Dr. Headlam reviewed Pritchett's back pain history as follows:

> [Pritchett's] low back pain began eight years ago.  He denies any trauma, but does state that his job, which involved manual labor in a warehouse, did aggravate his symptoms.  His low back pain is located in his lumbar region.  He describes this as a stabbing and aching sensation.  He also reports radiation of his symptoms down his left lower limb posteriorly ending at mid calf.  His symptoms are aggravated by most activity and he cannot think of anything that relieves his symptoms.  His pain score is 7/10.  He reports that his back pain is constant.  He has had physical therapy with minimal relief.  Per chart review, he has also had lumbar facet injections in October of 2004.  He says that this did not relief [sic] his symptoms.

(Administrative Record at 528.)  Upon physical examination, Dr. Headlam diagnosed Pritchett with low back pain and left lumbosacral radiculopathy.  Electrodiagnostic studies showed evidence consistent with sensory motor ployneuropathy, right cervical radiculopathy, and mild bilateral carpal tunnel syndrome.  Dr. Headlam recommended lumbar epidural steroid injections as treatment.

On December 7, 2005, Dr. Headlam gave Pritchett an epidural steroid injection at L5-S1 of his spine.  At a follow-up appointment on December 27, 2005, Pritchett reported short-term relief from the epidural steroid injection, but later his back pain increased.  Dr. Headlam prescribed Neurontin as treatment.  On February 14, 2006, Pritchett reported that his back pain had not changed since December 2005.  On February 28, 2006, Pritchett informed Dr. Headlam that since switching medication to Lyrica, he had "significant" improvement since his previous visit on February 14.  At a follow-up appointment on March 28, 2006, Pritchett reported that the Lyrica was not as effective at pain relief as it had been at the end of February.

On June 27, 2006, Pritchett met with Dr. Kristine M. Conditt, Ph.D., for a mental status examination.  Dr. Conditt described Pritchett's mental status as follows:

> Mr. Pritchett has experienced a lot of bullying and traumas in his life.  He has a history of oppositional behavior including alcohol dependence, drug use, and arrests for breaking into homes.  He also has had a lot of losses in this life including losses of relationships and of his health.  He has multiple health concerns including a bad back, seizures, asthma, allergies, diabetes, ulcers, acid reflux, and carpal tunnel.  He has a long history of depression and suicide attempts and continues to struggle with suicidal ideation.  He has a lot of social anxiety that takes on an almost paranoid feeling, likely because of so many traumas in his past.

(Administrative Record at 500).  Dr. Conditt estimated that Pritchett's overall intellectual ability was in the low average range.  Dr. Conditt diagnosed him with major depressive disorder and anxiety disorder.  Dr. Conditt drew the following conclusions regarding Pritchett's functional capabilities:  (1) His ability to understand instructions, procedures, and locations is in the low average to average range; (2) his ability to carry out instructions and maintain concentration and pace would be limited by his physical difficulties with pain; (3) his ability to carry out instructions and maintain concentration and pace would also be limited by his depression and anxiety, making it difficult for him to be around others, make good decisions, and concentrate on his tasks; (4) his ability to interact appropriately with supervisors, co-workers, and the public would be limited by his anxiety and lack of trust of others; and (5) his depression and anxiety would likely interfere with his ability to use good judgment and respond appropriately to changes in the workplace.

On June 29, 2006, Pritchett underwent a disability evaluation performed by Dr. Usha Anand, M.D.  Dr. Anand noted that Pritchett's chief complaints were low back pain, carpal tunnel syndrome, acid reflux, history of seizures, history of diabetes, and history of asthma.  Upon examination and review of his medical records, Dr. Anand concluded that:  (1) Pritchett's seizures were controlled if he takes his medications; (2) his asthma was under control; and (3) his carpal tunnel is doing better after surgery.  With

regard to the acid reflux, Dr. Anand noted that Pritchett was taking medication as treatment. Lastly, Dr. Anand opined that Pritchett's low back pain has features of radiculopathy. Specifically, Dr. Anand found that Pritchett:

> continues to suffer from significant amount of pain in the back region, which prevents him from standing more than 10 minutes[, which in turn,] prevent[s] him from walking more than half-a-block[,] and [he] is unable to stoop[,] bend[,] or lift weight more than 20 pounds.

(Administrative Record at 509.)

On July 25, 2006, Dr. Jane Bibber, Ph.D., reviewed Pritchett's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Pritchett. On the Psychiatric Review Technique assessment, Dr. Bibber diagnosed Pritchett with major depressive disorder and anxiety disorder. Dr. Bibber determined that Pritchett had the following limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Bibber determined that Pritchett was moderately limited in his ability to: maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. Dr. Bibber further determined that Pritchett was markedly limited in his ability to: understand and remember detailed instructions, carry

out detailed instructions, and interact appropriately with the general public. Dr. Bibber concluded that:

> There is no convincing evidence that [Pritchett] is mentally unable to perform simple, unskilled tasks. His MDIs [(Medically Determinable Impairments)] may cause difficulties with his interaction with the public and with his concentration. . . . The MDIs only moderately limit his mental work-related abilities. [Pritchett] is mentally capable of engaging in simple, competitive employment[.]

(Administrative Record at 570.)

On August 21, 2006, Dr. James D. Wilson, M.D., reviewed Pritchett's medical records and provided DDS with an RFC assessment. Dr. Wilson determined that Pritchett could: (1) occasionally lift and/or carry 50 pounds, (2) frequently lift and/or carry 25 pounds, (3) stand and/or walk with normal breaks for at least six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Wilson found no postural, manipulative, visual, communicative, or environmental limitations. Dr. Wilson concluded that Pritchett's "daily activities are not significantly limited. The information in file is generally consistent and supports the conclusion that he is capable of activities as outlined."[7]

In May 2007, Pritchett was referred by his attorney, to Daniel L. Ekstrom, Psy.S. ("Ekstrom"), a licensed psychologist, for a psychological evaluation. At the evaluation, Ekstrom administered the Wechsler Adult Intelligence Scale-III test to Pritchett. The results of the test showed that Pritchett had a verbal IQ score of 86, performance IQ score of 84, and full scale IQ of 84. Ekstrom interpreted the scores to be low average. Ekstrom also administered the Minnesota Multiphasic Personality Inventory test to Pritchett. In interpreting the results of the test, Ekstrom opined that Pritchett was:

> not well psychologically defended. He is likely to have poor coping resources and feel emotionally uncomfortable.

---

[7] *See* Administrative Record at 582.

16

> Additionally, the profile is associated with poor impulse control. He is likely to have poorly regulated behavior and moods and frequently lose control of his temper. Lastly, the profile suggest[s] a pattern which is rather chronic, as opposed to acute.

(Administrative Record at 624.) Ekstrom diagnosed Pritchett with mood disorder, social phobia, and personality disorder with paranoid and anti-social traits. Ekstrom concluded that:

> It is the examiner's opinion that [Pritchett's] collective limitations are significant. His profile and history suggest a chronic disorder with a poor to guarded prognosis. From an intellectual standpoint, Mr. Pritchett appears to be functioning within the upper portion of the Borderline to lower portion of the Average range of intellectual abilities. Although he may need some slight accommodations in terms of learning jobs, his disability is only considered to be mild in this domain. As a result of his somatic preoccupation, level of emotions, and social apprehension, he is likely to have difficulty being able to execute his job with regard to concentration, persistence, and pace. One would anticipate that he will continue to have interpersonal problems on the job site in terms of getting along with others, relating to supervisors, and accepting feedback. He finds it very difficult to be objective about these matters. Lastly, he has had a history of poor judgement and impulse control.

(Administrative Record at 625.) Ekstrom also filled out a Mental Impairment Questionnaire for Pritchett's attorney. Ekstrom determined that Pritchett had the following limitations: moderate restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. Ekstrom also believed that Pritchett would have one to two episodes of decompensation lasting two weeks within a 12-month period.

On June 11, 2007, Pritchett visited Redouane Goulmamine, M.D., complaining of middle and low back pain. Upon examination, Dr. Goulmamine diagnosed Pritchett with lumbago and depression. Dr. Goulmamine opined that he believed "the main problem with [Pritchett] is his depression and all these symptoms are just a somatization of his

depression. Dr. Goulmamine recommended physical therapy so that Pritchett could learn to cope with his pain. Pritchett declined to be treated with physical therapy.

On January 29, 2008, Pritchett met with Dr. Farid Manshadi, M.D., for an independent medical evaluation. In generating his opinions, Dr. Manshadi both examined Pritchett and reviewed various medical records for Pritchett from 2006 and 2007. Upon examination, Dr. Manshadi diagnosed Pritchett with: (1) Left-sided shoulder pain with reduced range of motion; (2) chronic low back pain with evidence of radiculopathy in the lower extremities on EMG, but normal MRI findings; (3) bilateral carpal tunnel syndrome; (4) peripheral ployneuropathy; (5) reduced left hand grip; (6) reduced strength in the left hip and left knee; and (7) reduced lumbar range of motion. Dr. Manshadi also filled out a "Medical Opinion of Ability to Do Work-Related Activities" sheet provided by Pritchett's attorney. Dr. Manshadi opined that Pritchett could: (1) occasionally lift and carry 10 pounds, (2) frequently lift and carry 10 pounds, (3) stand and/or walk with normal breaks for less than two hours in an eight-hour workday, and (4) sit with normal breaks for a total of about two hours in an eight-hour workday. Dr. Manshadi also determined that Pritchett could sit for 45 minutes before needing to change positions, and stand for 5 minutes before needing to change positions. Dr. Manshadi further determined that Pritchett could occasionally stoop, bend, crouch, climb stairs, and climb ladders. Dr. Manshadi opined that Pritchett's ability to reach, finger, push/pull, handle, and feel were affected by his impairments. Lastly, Dr. Manshadi believed that Pritchett's impairments would cause him to be absent from work about four days each month.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Pritchett is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir.

2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id*. The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Pritchett had not engaged in substantial gainful activity since April 12, 2005. At the second step, the ALJ concluded from the medical evidence that Pritchett had the following severe combination

of impairments: degenerative disc disease of the lumbar spine, status-post hernia repair, major depressive disorder, anxiety disorder, alcohol abuse, bilateral carpal tunnel syndrome, and left shoulder rotator cuff tendinitis/peritendinitis. At the third step, the ALJ found that Pritchett did not have an impairment or combination of impairments listed in "20 C.F.R. [§] 404, [Appendix 1, Subpart P, Regulations No. 4 (the Listing of Impairments)]." At the fourth step, the ALJ determined Pritchett's RFC as follows:

> [Pritchett] has the residual functional capacity to perform light work . . . involving only occasional bilateral handling and fingering. Additionally, [Pritchett] should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation; avoid concentrated exposure to hazards such as unprotected heights and moving machinery; and should do no driving on the job. [Pritchett] is able to perform simple, routine, repetitive tasks involving only simple work-related decisions and few work place changes at no more than a regular pace. Further, there should be no requirement to read instructions, write reports, or do math calculations, and only occasional contact with co-workers or the public.

(Administrative Record at 18.) Also at the fourth step, the ALJ determined that Pritchett could not perform any of his past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Pritchett could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Pritchett was not disabled.

### B. Objections Raised by Claimant

Pritchett argues that the ALJ erred in four respects. First, Pritchett argues that the ALJ's RFC assessment and hypothetical questions to the vocational expert Vanessa May at the supplemental hearing, were flawed because the ALJ failed to provide for all of Pritchett's credible limitations. Second, Pritchett argues that the ALJ failed to give good reasons for discounting the opinions of two examining sources, Drs. Anand and Manshadi, with regard to his physical limitations. Third, Pritchett argues that the ALJ's decision is not supported by substantial evidence from an examining source. Lastly, Pritchett argues

that the ALJ failed to ascertain whether there were any inconsistencies between the testimony of vocational expert Vanessa May and the Dictionary of Occupational Titles.

### 1. *RFC Assessment and Hypothetical Question*

Pritchett argues that the limitations included in the ALJ's hypothetical question to vocational expert Vanessa May, based on the opinions of Dr. England, the medical expert who testified at the supplemental hearing, were incomplete. Specifically, Pritchett points out that "[t]he ALJ's assessment does not accurately reflect [Dr. England's] moderate limitations in maintaining concentration and attention for extended periods, performing activities within a schedule or maintaining regular attendance, and completing a normal workday or workweek without interruption of psychologically based symptoms."[8] Pritchett also argues that the ALJ failed to include Dr. England's opinions regarding his periodic deterioration due to depression which causes marked limitations in maintaining social functioning and in concentration, persistence, and pace, in her hypothetical question to vocational expert May.

Hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). The ALJ is required to include only those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Haggard v. Apfel*, 201 F.3d 591, 595 (8th Cir. 1999) ("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.' *See Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994) (quoting *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir. 1985).").

At the supplemental hearing, Dr. England opined that:

> . . . other than those periods of exacerbation that at a moderate level of impairment would be . . . understanding and

---

[8] *See* Pritchett's Brief at 12.

remembering detailed instructions as well as carrying them out, maintaining concentration and attention for extended periods, performing activities within a schedule or maintaining regular attendance, working in coordination or proximity to others without being distracted, again, completing a normal workday or workweek without interruption of psychologically based symptoms, interacting with the public appropriately, accepting instructions and responding appropriately to criticisms, getting along with co-workers or peers, traveling in unfamiliar places or using public transportation and setting realistic goals or making plans independently of others. I would say those would all likely be moderate more or less ongoing and I would say the others would be either non-significantly limited or there is not evidence of limitations.

(Administrative Record at 103-04.) The ALJ's hypothetical question to vocational expert May included the following RFC assessment regarding Pritchett's mental impairments:

The person is able to do only simple, routine, repetitive work, no requirement to read instructions or write reports, only simple work-related decisions and few workplace changes, only occasional contact with the public and co-workers and no more than a regular pace.

(Administrative Record at 114.)

In *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996), the Eighth Circuit Court of Appeals found that limiting a claimant to simple work was not sufficient to capture the concrete consequences of the claimant's deficiencies in the area of concentration, persistence, or pace. *Id*. at 695. In *Brachtel v. Apfel*, 132 F.3d 417 (8th Cir. 1997), the Eighth Circuit found that relying on a hypothetical that included the ability "to do only simple routine repetitive work, which does not require close attention to detail" and limiting the claimant to not working "at more than a regular pace" properly captured the concrete consequences of the claimant's deficiencies in the area of concentration, persistence, or pace and was distinguishable from *Newton*. *Id*. at 421.

While similar to *Brachtel* -- the ALJ limited Pritchett to working at a regular pace -- the ALJ failed to set forth Pritchett's limitations based on concentration and persistence. *See Newton*, 92 F.3d at 695 (limiting a claimant to simple work is not sufficient to capture

the concrete consequences of the claimant's deficiencies in the area of concentration, persistence, or pace). The Court finds it significant that Dr. England found the following limitations for Pritchett: (1) Understanding and remembering detailed instructions as well as carrying them out, (2) maintaining concentration and attention for extended periods, and (3) performing activities within a schedule or maintaining regular attendance. Because these limitations relate to Pritchett's abilities in the areas of concentration and persistence, and the ALJ failed to properly describe these limitations in her hypothetical to vocational expert May, the Court determines that the ALJ failed to properly "capture the concrete consequences of the claimant's deficiencies." *Hunt*, 250 F.3d at 625. Therefore, the Court determines that this matter should be remanded to allow the ALJ to formulate a hypothetical question which captures the concrete consequences of Pritchett's deficiencies, including his deficiencies in the area of concentration and persistence. *See Id*. Additionally, the Court believes that the ALJ should address the issue of Dr. England's opinions regarding Pritchett's periodic deterioration causing marked limitations one to two times per year for less than two weeks at a time in any hypothetical question provided to a vocational expert.

### 2. The Opinions of Drs. Anand and Manshadi

Pritchett argues that the ALJ failed to give good reasons for discounting the opinions of Drs. Anand and Manshadi. Pritchett maintains that upon examination, both doctors determined that he had certain physical limitations which were not addressed by the ALJ. Specifically, Dr. Anand found that Pritchett:

> continues to suffer from significant amount of pain in the back region, which prevents him from standing more than 10 minutes[, which in turn,] prevent[s] him from walking more than half-a-block[,] and [he] is unable to stoop[,] bend[,] or lift weight more than 20 pounds.

(Administrative Record at 509.) Dr. Manshadi found that Pritchett could: (1) occasionally lift and carry 10 pounds, (2) frequently lift and carry 10 pounds, (3) stand and/or walk with normal breaks for less than two hours in an eight-hour workday, and (4) sit with

normal breaks for a total of about two hours in an eight-hour workday. Dr. Manshadi also determined that Pritchett could sit for 45 minutes before needing to change positions, and stand for 5 minutes before needing to change positions. Pritchett argues that the ALJ's RFC assessment lacks Drs. Anand and Manshadi's findings, and her decision lacks any explanation for not including these findings.[9]

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. §§ 404.1527(d), 416.927(d). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

An ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*,

---

[9] *See* Administrative Record at 18. The ALJ's RFC assessment includes the following physical limitations:

> [Pritchett] has the residual functional capacity to perform light work . . . involving only occasional bilateral handling and fingering. Additionally, [Pritchett] should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation; avoid concentrated exposure to hazards such as unprotected heights and moving machinery[.]

(Administrative Record at 18.)

361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184(S.S.A.).

Additionally, an ALJ also has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

In her decision, the ALJ thoroughly reviewed the findings of Dr. Anand, but failed to give Dr. Anand's opinions any weight or address whether she agreed or disagreed with Dr. Anand's findings. The ALJ also thoroughly reviewed Dr. Manshadi's opinions and gave Dr. Manshadi's opinions "some weight." The ALJ failed, however, to explain why she gave Dr. Manshadi's opinions "some weight." Significantly, the ALJ presented no discussion of Dr. Manshadi's findings regarding Pritchett's physical limitations as they relate to his ability to stand, sit, walk, or lift.[10] Instead, the ALJ focused on an apparent misdiagnosis of polyneuropathy based on diabetes mellitus and the fact that Pritchett's attorney referred him to Dr. Manshadi for purposes of his Social Security Appeal.

---

[10] *See* Footnote 9 (ALJ's RFC which contains no consideration of the findings of Drs. Anand and Manshadi with regard to Pritchett's physical limitations).

It is worth repeating that an ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. An ALJ must also assess a claimant's RFC based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803. Relevant evidence includes the opinions of examining physicians. *Lacroix*, 465 F.3d at 887. If an ALJ's RFC assessment conflicts with an opinion from a medical source, the ALJ is required to explain the reasons for failing to adopt the opinion(s) of the medical source. *See* SSR 96-8p, 1996 WL 374184(S.S.A.). The Court finds that the ALJ has failed to meet these requirements. Specifically, the Court determines that the ALJ failed to provide any reasons, let alone "good reasons" for either including or excluding the opinions of Drs. Anand and Manshadi in her RFC assessment. *See* Social Security Ruling, 96-8p ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."); *see also McCadney v. Astrue*, 519 F.3d 764, 767 (8th Cir. 2008) ("The problem with the ALJ's opinion is that it is unclear whether the ALJ did discount [the doctor's] opinion, and, if [the ALJ] did so, why."). Therefore, the Court finds that this matter should be remanded so that the ALJ may fully and fairly develop the record with regard to Drs. Anand's and Manshadi's opinions. On remand, the ALJ shall provide clear reasons for accepting or rejecting Drs. Anand's and Manshadi's opinions and support her reasons with evidence from the record, particularly with regard to Pritchett's RFC.

### 3. *Pritchett's Remaining Objections*

Pritchett's remaining objections to the ALJ's decision pertain to: (1) Whether the ALJ's decision was supported by substantial evidence from an examining source; and (2) whether there were any inconsistencies between the testimony of vocational expert Vanessa May and the Dictionary of Occupational Titles. Because the Court determined in sections ***V.B.1*** and ***2*** that this matter should be remanded for the ALJ to (1) formulate a hypothetical question for the vocational expert which captures the concrete consequences of Pritchett's deficiencies, and (2) fully and fairly develop the record with regard to Drs. Anand's and Manshadi's medical opinions, the Court concludes that it need not

address Pritchett's remaining claims. The Court is confident that Pritchett's remaining objections will be addressed on remand because the ALJ must consider the opinions of Drs. Anand and Manshadi, two examining sources, and provide a vocational expert with a hypothetical question which captures the concrete consequences of Pritchett's impairments.

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to fully and fairly develop the record with regard to the opinions of Drs. Anand and Manshadi, and provide the vocational expert with a proper hypothetical question. Accordingly, the Court finds that remand is appropriate.

## VI.  CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ shall develop the record fully and fairly with regard to the opinions of Drs. Anand and Manshadi, provide clear reasons for accepting or rejecting their opinions as they relate to Pritchett's RFC, and support her reasons with evidence from the record. The ALJ must also formulate a hypothetical question which captures the concrete consequences of Pritchett's impairments.

## VII.  ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this _10ᵗʰ_ day of February, 2010.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA